I want to focus, at least initially, on the Fourth Amendment analysis, or we would argue lack of analysis in the District Court's opinion. And the District Court basically did not go through the full Graham v. Conner analysis, took facts in the light most favorable to the defendants, did not deal with any of the facts in the light most favorable to the plaintiff, which is what is the standard. And I'd focus on the main disputes, I think, which should resolve the appeal in our favor on that matter, which is the dispute over whether Mr. Wendman at the end extended his arm and pointed a gun. So, Counsel, I understand your point based on the expert report, based on the autopsy report. Is there any dispute, first of all, that, to use your words, at the end, your client raised and lowered the gun twice? I think there's testimony that he raised the gun. I think it's not unclear exactly what that means. But the testimony is that's what the officers said. He raised it twice, was told to put it down, and did. But I think there's a difference. In other words, he manipulated the gun for four hours. There's testimony about the fact that he had the gun up at times. He was told to lower it. He was told to put it in places. The reason that Officer Jameson gave to take the shot was that he had his arm extended and pointed it at the officers. He drew a diagram of that. That's what he said. The testimony was there were two things, put the gun down after he was told to, and then there was something a third time, which you dispute what it was, but there was something that happened the third time. But what Officer Jameson says is that he saw the gun come up and down quickly, up and down quickly, and then he waited for it to happen again so that he could shoot him. He never communicated that that was a problem to anyone there, even though under the policies of the North Las Vegas Police Department, there was a tactical commander. Notice he didn't say, I think there's a problem here. He was a football field away. There were officers in a Bearcat 20 yards away. And in fact, Sergeant Lawrence from the other Bearcat testified that he didn't see any officers in danger. But on the specific question of whether Mr. Wendman in fact raised the gun that third time, we have Jameson's testimony that he did. What is the best evidence that or is there any evidence that he didn't? Well, the main evidence, I think, is that whatever he did that third time, by the time he was shot, the gun was down, his arm was down on the side because he was shot through the torso and it obliterated his elbow. In other words, if the gun was like this, when the shot was fired, it wouldn't have hit him. But doesn't the coroner's report support that his arm was bent at the elbow, if not at the shoulder? It's not clear about that. What it's clear is that the elbow was at his side. But that was true for most of the four hours. But sir, it doesn't mean, this is important, at least on my scorecard. I think there's physical evidence that supports the reading that the elbow was bent at his side, but I take that to mean that the gun had been raised. And I appreciate your point that that had been true for hours, on and off, and that the folks closer to him didn't think he was going to shoot. But that is, it seems to me, to be an important point because the person who fired that shot can be wrong. As long as he's not unreasonable, he's still entitled to qualified immunity. So what is your response to that, please? Well, I think that, well, I don't know if you want me to get to qualified immunity first. I'm just trying to get to the point, it seems to me, whether his arm was straight out in front of him or not. If that elbow is raised and there's physical evidence to confirm that, then why wouldn't we conclude that the gun was raised? But the gun, in terms of where the gun was on his body, it moved around the whole time. None of the other officers thought there was a threat. None of them. They were all undercover. That's not the question. The question is whether the person who pulled the trigger reasonably believed that there was a danger to the officers, isn't it? Isn't that the question? Well, yes, in a sense. But the thing is that he didn't know where the other officers were. They were undercover. They were in a bearcat. Those two statements, I think there's a contradiction there. Because what matters to the objective reasonableness, what matters is the objective reasonableness of Officer Jamison's actions, right? So we have to look at what he knew and whether the other officers were or were not undercover. Is there any evidence that he knew that they were undercover? He knew that there was a bearcat, which the purpose of which was to keep them undercover. Right, but I mean, we can... He didn't know one way... At the time he shot, he didn't know even where they were. Okay, well then doesn't that... I mean, that seems to be a significant fact and not one that helps you. Because if he doesn't know where they are, then he doesn't know that they're undercover. And he knows that Mr. Wendman is sort of pointing a gun, is pointing a gun in the general direction of where there are officers. If he doesn't know that they're undercover, isn't it reasonable for him to perceive that as a threat? No, I don't think it's reasonable. There's a perimeter so that civilians are gone. They've been talking to him for four hours. He knows that there's a less lethal operation that's about to be done. He can't see any officer in danger. There's a bearcat, the purpose of which is for everybody to be undercover. He should know that. That's part of the procedure. He knows that there's a tactical commander with people on eyes, 20 yards away from this guy, who could tell him to shoot if there was a danger. He could have said, you know, I see this guy raising his arm in a funny way. I think we should shoot him. Give him a warning. Why not give him a warning? So, Counsel, if we were to look at the second prong of qualified immunity... Yes. The facts, as I understand them, as undisputed, are he had fired a shot. He'd shot himself. Well, he'd fired a shot four hours before. Yes. He had told a civilian, it's going to get bad. You've got to go. He had been told multiple times to give up the gun, and he refused. This is not going to happen. I'm not going to give it up. I've nothing to live for. There was on a car what a reasonable person in the police position would read as a suicide note. Well, they didn't know that at the time they shot. Pardon me? They didn't know that at the time they shot. They didn't have the note? Jamison didn't have the note. Okay. All right. Then I'll take that back. And he refused to give it up and said, I've nothing to live for. And at the end, I think the facts are he raised the gun two times and did something the third time. If you take my view of the facts as correct, even in the light most favorable to your client, what case would have put the officers on notice at other than a high level of generality that they couldn't shoot? Well, from our standpoint, the line of cases that starts with Harris versus Roderick, which is a sniper case where this court said you can't kill somebody because they have a gun. Right. There has to be an immediate threat and you can't kill somebody just because they've got a gun. And then I would follow that with George and Curnow. Now, in Curnow, you've got officers coming into a living room with somebody that they say has a gun and has a gun. And this court said, no, there's a dispute about whether there's an immediate threat. The fact that he had a gun, even though you're not undercover and you're in a living room, is not enough to decide that, to take that away from a jury to decide. In George, it was the same thing, coming into somebody's house without cover. So the person's got a gun. It's not enough to kill him. There's got to be proof of an immediate threat that they're actually going to be able to use that gun against you. There's no evidence of that here. The evidence is that they were undercover. I would take a state of Lopez as another case in this line of cases, where you've got the 15-year-old with the toy AK-47 and the officers don't know if it's an AK-47. The kid starts turning around and they kill him. And this court said, no, that's not enough. He's got what you think is an AK-47 and his turning is not enough to kill him. What you have to do is you have to ascertain that there's an immediate threat. And I would say those are a fortiori cases to this case. This is a sniper who's a football field away with another sniper next to him that doesn't shoot or doesn't see that. Everybody else on the scene doesn't support the fact that his... The other sniper, Lee, I believe in his interview after the incident, said that he was a fraction of a second away from taking the shot himself, didn't he? A fraction to shoot himself? Lee would have shot himself if Jamison hadn't. You said nobody else there perceived this. That's not quite true. Actually, I think it's important to say this. The police department, except for Jamison, did all the right things in accordance with this court's teachings, right? They didn't shoot. They had guys with guns in back of the Bearcat. To go to Judge Miller's point, I'm looking at 4 ER 637. Lee, when he saw Wendman raise the gun the final time, he told Jamison, gun, gun, gun, gun. And that's when Jamison shot. And Lee was adjusting when Jamison took the shot. And Lee said he was about a quarter of a second from taking the shot himself and would have done it if Officer Jamison didn't shoot first. But the forensic evidence, and if you go back to Gonzales v. City of Anaheim and all the cases that this court has said, when the person who's dead is not there to testify, he can't tell you now that he had his gun at the side they thought that he shot himself, which suggests that when he was shot, the gun was pointed down. And so there's a disputed fact about what was going on. Sure, he was moving around with a gun, but there's testimony in the record by all the people on the scene that they did not feel threatened. Is there any dispute of fact that Officer Lee said right before Jamison shot, gun, gun, gun, gun? That's the testimony. You know, I don't have a refutation of that. But I think that that testimony, if I recall it correctly, is that Lee was not saying shoot, shoot, shoot. He was saying gun, gun, gun. Now, he had a gun for four hours. I mean, you can look at the tapes. I mean, right before he shot, the negotiators talking to him. They paused the less lethal operation, which, by the way, included a potential for lethal force. What they were going to do is they're going to throw a flashbang, try to get the gun out of his hand, and they were going to send the dog in to make sure he couldn't get it. And then they were going to take him into custody. They knew from the very beginning that this was a mentally disturbed guy who was not threatening them. He never threatened anybody. Never. Not once. He said he was pro-police. He was obviously in an existential crisis. And so when they told him, for example, at the end, you're coming too close to us. Go back to the tree. He went back to the tree. And they paused the less lethal operation so that they could continue to talk to him. And then Jamison took it on himself to kill him. We have case law about the duty to warn if it's practicable to warn. The duty to warn before using deadly force if it's practicable to warn. And you mentioned that earlier in your comments, and I would like to hear who you think was going to do the warning. What is the interval here where that could have happened? Jamison was in contact by radio with people in the Bearcats, both of them. And so if he said, look, I think this raising of the gun thing is dangerous, he should have communicated that right away. Said, give him a warning. If he does it again, he's going to get shot. Well, who was going to give him a warning? They were close enough to do that, but not the people who were, not the individual who actually shot him. As you have said, he was a football field. He was in communication. He understood. He could have communicated to them. He was supposed to be. He was there for observation and intelligence. That was the whole part of the sniper's role. How was he going to communicate before shooting? He was a football field away. He was a football field away. So what you're suggesting is that the folks in the Bearcats... Well, but in other words, he could have radioed to the people that were 20 yards away. See, I'm sorry. No, I appreciate that. I think that's the way it would have... You don't owe me an apology. This is a very frustrating and tragic case. But it seems to me that he would have had to do that. He would have had to communicate with the folks in the Bearcats who were trying to communicate with the decedent who had refused a cell phone. And so they were doing the best they could. And for four hours, they were doing pretty well. I think that's right. I think that's right. Heroic efforts. But I'm trying to figure out in the moment what makes this observation, gun, gun, gun, gun, and your position is that that's the moment, right? He had a... It was feasible for one thing. If they really thought that there was danger by various things he was doing all along, they had four hours to give him a warning. What they did is the right thing. They were trying to save his life, right? That's what they were trying to do. And in fact, all the people on the scene, the people who were supposed to make the decisions, didn't think that there was any danger to people and that they could continue to negotiate with him. And if they could, if they couldn't finish the negotiation, they could do this less lethal operation and take him into custody without killing him. Your strongest argument that his decision that there was an immediate danger to the officers, right? Excuse me? Your strongest argument that the person who pulled the trigger made an unreasonable determination...  Hold on, hold on. I haven't asked the question yet. I'm sorry. That's all right. We've taken you far afield in a lot of directions. This is an important case. I just want a concise statement, please, that the person who pulled the trigger made an unreasonable determination when he decided that he thought other officers were in imminent danger. What's your very best shot? Well, in order to take a shot, you have to have facts to sustain whether there's danger. He had no facts to sustain danger other than the movement of the gun. And in fact, all of the other officers didn't feel that danger and were undercover. And it was unreasonable for him to take the shot without getting more information, for one thing, which he could have done. He could have communicated with them, which he was supposed to do, and say, are the negotiations failing? That was one of the other things he thought, which was completely not true because they were continuing to negotiate at the point he shot him. From an objective standpoint, a reasonable officer having been given an order not to take independent action without communicating, without a warning, without knowing anybody was in danger, and must have had a reasonable assumption that the Bearcats were there for cover. That's what they're there for. We have taken you considerably over. Thank you for your patience with our questions. When you come back, you can plan, we'll put a couple more minutes on the clock for you if you need it. We'll hear from opposing counsel, please. Thank you. Judge Bennett, Judge Christin, Judge Miller, Mr. Hoffman, may it please the court, my name is Frank Todry, I'm appearing for the defendant at please the city of North Las Vegas referenced as CNLV within the briefing. Because this case was decided on summary judgment, our standard is de novo. We would express our gratitude to the court for permitting us to present our briefs and oral arguments. Primarily at issue is Judge Mahan's order granting summary judgment, ECF number 79 from September 2023. We would ask this panel to affirm the decision, return it to the district court with no further instructions. What is your response if we could focus you on opposing counsel's strongest argument, which is that it was unreasonable, I'm paraphrasing, but you heard it, it was unreasonable to determine or suspect that other officers were in imminent danger because he couldn't see any other officers and after all there were bearcats there and the assumption would be if they're following protocol, those officers aren't exposed. What about that? The lion's share of case law asks our courts and our district court judges to consider the totality of the circumstances at that point. At that point, while Judge Mahan did not directly put out his list of findings and the findings of fact query, he did throughout his order incorporate several factors in which he considered undisputed. So to wit, I would suggest that at the exact circumstances of Officer Jameson taking the shot, he was aware of the totality of it, that Wendman had had the handgun, he had shot the gun earlier, he had fired at least one round in public, there was apartment buildings around, but most importantly, he raised the gun three times and at that point, Officer Wendman in that split second perceived an imminent danger from where he was stationed to his other officers in regards to the gun being raised. Could you focus right on that point because my question just went to that last point. I asked opposing counsel to address that, so did Judge Miller. If he couldn't see any other officers and he knows what the protocol is and he knows the officers are in the Bearcats and those of course are, they're not bulletproof, we're certainly aware of that, but the intent is to provide cover, why was it reasonable for him to suspect that officers were in danger if he couldn't see any in danger? Well, at this point, the two primary, probably the two, quote, best evidences on that regard are probably Officer Lee, the officer next to him, the other sniper, and Officer Jameson himself. And we must take, I would suggest that Judge Mahan took account of their testimony and reports that at the moment of the gun being raised, he believed that his fellow officers were in danger even without any cover based upon the movement, the movement of Mr. Wendman. And of course we acknowledge that the exact shooting was not caught on camera because the body camera is essentially smack dab in the middle of the chest, so the other officers were taking cover at the time. But I think the point of, I don't know if it was the point of the question, my question is, the movement of the hand and the raising of the gun is an imminent threat to anyone who is within a line of sight of the gun. It is not an imminent threat to anyone who is safely ensconced behind the bullet-resistant vehicle. So what is there about what Jameson knew that would lead him to think that there was an imminent threat in that moment? I think, I believe that if we, we look back on his deposition and we consider how he had drawn the diagram to present what he perceived as the area of danger or as other officers were, he had suggested that at the time when the gun was raised, he believed his officers were in danger and that is why he took the shot. And I believe that our case law has suggested that, well, if we look at the... But right there, that's what Judge Miller and I were asking. Why is that reasonable? Yes. Why wasn't it reasonable for him to think that other officers were in danger if he couldn't see any within the line of sight as Judge Miller put it? I think it's kind of just the total of it all. We had, Mr. Wendman had refused to drop his gun over 50 times. He had violated four statutory criminal laws during that standoff. He was absolutely resistive. While he was not necessarily waving the gun at everyone and jumping all around, he disobeyed at least 50 orders from that navigator. He refused to take the cell phone to talk with, not the navigator, the negotiator. He refused to take the cell phone to talk with the negotiator. He took water, but there was no indication that there was any progress with this person. And also, from Jameson's perspective, it did not seem that there was a chance, as it were, to use the least intrusive means that my colleague suggested. That's all. I'm not sure you've really answered Judge Christen's question, but let me read to you from Officer Jameson's deposition. For ER 782, question, and it's page 174. Well, you couldn't see the officers, so you don't know whether he presented it at the officers, right? Answer, right. But I know where they, like the area they were in. Question, that you believe they were in. Answer, yes. But from, question, but from what you could see, he was aiming at the bearcat. Yes, or right. So, if you can explain why, if he thought that the third time the decedent raised the gun, he was aiming at the bearcat, that that meant the danger was imminent for him to fire and kill the decedent. I'm reviewing Judge Mahan's findings on this aim, and excuse me, when he raised the, excuse me, when Wenman raised the gun for the third time, there was a pattern of never relinquishing this weapon or surrendering to police presence. I'm sorry, I couldn't understand. Oh, excuse me. There was a pattern of what? Of Mr. Wenman never voluntarily relinquishing this weapon or surrendering to the peace presence. Or what? With the third, surrendering to the peace presence. Thank you. Thank you very much. I should have probably brought a glass of water up here with me for this. But, the only requirement was for Wenman to peacefully conclude the confrontation. That is, we can only, we can only look at the exact testimony that, from Officer Jameson, suggesting that he believed that the danger was imminent at that very point. A bearcat is armored, but it's not a traditional barricade. When we look at the, and this is important because when we can, especially when we compare it to the other cases and the QI analysis that both sides presented, this was a unique situation of the police having non-traditional bearcat guards, an open area, possible civilian danger with the apartment complexes. And so, he had to make that, Officer Jameson had to make that decision that his officers' lives were in danger at that moment. And if you listen to,  the negotiator, she appears to, her last sentences are kind of along the lines of, are almost sounding panic. So she also suggests that something was going on at the time that appeared to be a volatile moment. So it's undisputed, is it not, that both Wenman and at least some of the officers behind the bearcat were moving around to some degree during all of this, right? Yes, yes. Jameson had a fairly narrow field of view through his scope. Is that right? Correct. So, I mean, we can look, I mean, I'm looking at the, there's a diagram 633 of the record. And, you know, sort of looking at the diagram, it's a fairly straightforward exercise in trigonometry to figure out, like, if there would have been a line of sight between where Mr. Wenman was and where the officers behind the bearcat were. But I suppose Jameson would not have been able necessarily to figure that out at the moment. Is that fair? Correct. With one note, Judge Miller, that Jameson was familiar with and knew that each time that Wenman was continually shifting positions, this was forcing his fellow officers to also move and shift their positions. So based upon the four hours, we would suggest there's a natural supposition that these movements by Wenman are concurrently going to require movement by the officers. Okay, well, that seems not to help you very much. I mean, if that's true, then if what you're saying is that Jameson should have known that the officers were constantly shifting their positions so as to stay behind the bearcat, then I really don't see what the imminent threat is. If he, I think what you just said is like he would have known that as Mr. Wenman moved, the officers were moving so that they were always behind the bearcat. And if that's true, then how are they in danger? Because they have to expose themselves in each movement. I think the point is that they were able to continue to take cover. Isn't that, wouldn't that be an equally reasonable inference? Well, we would suggest there is a danger to each movement because they're taken out of the, out of their safe zone, as it were. And so I, we think that, look, there's a hindsight 2020 analysis, but our most important point to counter my colleague, Mr. Hoffman, is that in this split second, both of the snipers believe there to be an imminent danger to the officers and we're going to take the shot. And there was some, there was something obviously about this, this third raising of the gun that, that moved something different. Perhaps it's, perhaps this is becoming exhaustive. Four hours after, this many times he can respond. Perhaps it was, that it wasn't going to be reasonable to put the less intrusive. A canine thing would have been a suicide mission. Can I, can I focus on that one second and just ask you in the bit of time left to circle back to Judge Miller's question. Ian, what you're calling the split second.  What is the record evidence about what, what he could see? He was looking through the scope, right? What, what could he see? What could he hear? What, what exactly did he have? What information do you have right then? Correct. I think he had the, he had the essential knowledge of the, of where everybody was or everybody was positioned. Okay. Anything that was being put over the radio. Was anything being put over the radio that moment other than gun, gun, gun, gun? No. Other than that, at that moment, no. Okay. That's what I'm asking about. Okay. And he's looking through the scope and what could he see through the scope? We'll see if you're as good at trigonometry as Judge Miller. What could he see? He had Mr. Wendman, from what I, from what I'm ascertaining and remembering from the, from the act deposition was, in the scope was Wendman and probably about 10 feet around him. All right. How, and the, and the bearcat was, opposing counsel said 20, 20 feet or yards. Anyway, a lot closer. I believe it was feet. Okay. But for, allow a mistake. Okay. And what else do you think he knew then? Because we're trying to figure out what a reasonable officer would have known or done at that moment. What else, what other, what other information did he have? Oh, he knew he was a real gun and loaded. One thing that differentiated from some of the cases. Okay. We knew he had fired around in public.  We knew he was, well, not within the 20 foot barrier to apartment complexes. We knew he had officers and bearcats around him. We knew the apartment complex was less than 300 feet. Forgive me. I didn't interrupt you. The apartment complex was less than 300 feet. Okay. He knew, didn't he, that this, this was an ongoing emergency where there's concern that this person was having some kind of a psychotic episode.  Okay. And anything, anything else that we're overlooking? We knew he had turned down the cell phone, took water, disengaged several, about 50 times with the negotiator, raised his arm, extended it. And that, that's probably, probably the main undisputed facts, the ones that,  well, Judge Bennet didn't have a list. If you kind of, if one is to intersperse throughout his, throughout his, his order, those are, those are probably the ones that you get sides to, exactly. Thank you. He kind of does a general incorporation as it were. Yes. Yes. I think that's right. Is there any further questions, Judge Bennet? Just one thing. I can't find it right now. And this is my recollection of the record and you can correct me if I'm wrong. That Officer Jamison did not hear the other officer say, gun, gun, gun, gun. Am I right on that? I believe you are correct on that. It was going on the radio. Wait a minute. I thought, that's helpful to me. I thought in response to my question, you said that he could hear what was on the radio traffic and I thought that statement was on the radio traffic. Do I have that wrong? It's, it seems congruous. It seems simultaneous. Gun, gun, gun. So I think the record is slightly unclear as to whether he actually heard gun, gun, gun. I thought there was something in the record where he specifically said, I don't know whether it was in the depot or the lengthy officer involved shooting report where it was specific that Officer Jamison didn't hear Officer Lee say that. But right now, I can't find that. In the depot, oh please, please. Fully unfamiliar. I couldn't find that in depot. And that's the one I'm probably more photogenic on. We'll track that down. Okay. Is there anything further, Judge Miller? No. I just have one quick thing with the 20 seconds. It almost seemed like the main point of the appeal brief was that Judge Mahan incorrectly used discretionary immunity on talking about all the causes of action. And I just wanted to suggest that that is probably necessary because even though everything sounded in Federal and Monell, the second to last allegation in each cause of action brought up statutory claims. So I would suggest that it was not a mistake for him to even apply a discretionary. And he kind of had to because of all the estate of the decedent claims had an additional statutory component. Thank you. You're actually over your time by a minute. I saw 20 seconds. That's okay. I'll ask you to wrap up and thank you for your advocacy. We appreciate it very much. Thank you, Your Honors. Thank you, panel. Please put two minutes on the clock. We've taken you both over. Thank you. Thank you, Your Honor. I want to start with the raising three times. One point I'd want to make is that Jamison's the only one that really testifies about that. Other officers don't say that he pointed the gun. In fact, the Hudson investigation says that Jamison's really the only one. Not that the gun didn't move at all, but that exactly what Jamison says. I appreciate that dispute effect, but that's why the coroner's report was important to me. Am I missing something there? No, no. I think the one question is that it's unclear whether the autopsy report means what you say it meant in terms of pointing in that way. I think it's unclear what that means. I think that's one of the facts that would have... Could there be another way it could be interpreted? Or did you just invite me to take another look? One of the things is that at least the driver of the Bearcat, for example, and others thought that he had shot himself in the leg because they thought that the gun was down. So where the gun was when he was shot or right before he was shot is a little bit unclear. And again, going back to the guns, I mean, we have the forensic report. We have the various impressions of officers in terms of what happened. But we have a person, our client is dead, so he can't say what happened right before there or what the position was. All I'm suggesting is that there's evidence about there that it's very possible that when he was shot, the gun was pointing down. It's possible that the gun was slightly elevated like it had been throughout a lot of this episode. I don't think that... Another thing I think that's really important is there was no order to shoot. There were officers there who had all that information and could easily have said, instead of somebody saying, gun, gun, gun, they could say, there's a danger, shoot him. Now's the time. But it was exactly the opposite, actually. They were waiting to start the less lethal operation. And Jamison ended what was an appropriate set of police responses to a distraught man. And I think that it was objectively unreasonable and in this court's cases, there needs to be an immediate threat and objectively there was not an immediate threat and Jamison violated the constitutional rights. And on the discretionary immunity, by the way, if the court overturned the Fourth Amendment issue, that would also overturn... The court would have to deal with Manel and discretionary immunity and all those issues because those are dependent on that issue. It looks like we've got another question for you. Oh, okay, yes. So on what you just said, I have a fairly technical question. Okay. Let's assume, hypothetically, we were going to reject the Fourth Amendment claim only on prong two, that is the clearly established case law. Okay. How, in your view, and I know you don't want us to do that, but hypothetically, if we were to do that, how would that affect the determination that the district court made on the state law claims? If on the Fourth Amendment claim we were rejecting your claim but not on the ground that there was no constitutional violation but only on the ground of no clearly established case law? What would happen, as I understand the way it would play out, is that there would be a trial on the Fourth Amendment issue in any event because that would be determinative of whether there's discretionary immunity for state law claims and also there would be the possibility of Manel liability, which we've briefed fairly extensively but we haven't talked about here. But if there's a constitutional violation, there's no qualified immunity with respect to the city's liability under Manel. But I would end by hoping that you don't go that way. I want to thank you both, all of you, for your advocacy and your careful briefing. It's a very important case. We'll take it under advisement and we'll get to a decision just as soon as we can. We'll stand at recess for that.
judges: CHRISTEN, BENNETT, MILLER